The only allegation in the complaint which characterizes the act of Tompkins in shooting, or the conduct of Hammond in employing Tompkins and authorizing the use of the gun, is this: "That the plaintiff was shot and wounded through the negligence and improper and unlawful conduct of the defendants, and said injury was in no way contributed to by the plaintiff." The learned trial court observed, in denying the motion, that "the complaint is double-barreled," to which defendants' counsel replied: "We challenge the remark of the court that the plaintiff's complaint is double-barreled. We claim it is only for negligence." In this view of the learned counsel for the appellants we are inclined to concur, as far as the allegations in this complaint are concerned. It is fair to say, from the decision of this court upon the former appeal and from the cases cited in the opinion then delivered, that to the plaintiff the defendant Hammond owed no duty except that in the discharge of their business in the master's service his agents, who were instructed to protect the property and drive off intruders, should not treat him wantonly, maliciously, or inflict willful injury. If the agent's act was improper and unlawful to the extent of being reckless or wanton, the master was liable for the negligence of his servant. In omitting to discharge this duty, which the defendant Hammond owed the trespasser, so long as the servant's acts were within the general scope of his employment while engaged in the master's business, and done with a view to the furtherance of that business and the master's interests, he was negligent. Mott v. Consumers' Ice Co., 73 N. Y. 543, 547. The court could not then have compelled the plaintiff to elect, for an election presupposes alternatives. The manner in which the case was presented to the jury was entirely in accord with the rule as it had been laid down in this case, and we think the defendants' interests have in no manner been prejudiced.

The judgment should be affirmed, with costs. All concur, except JENKS, J., dissenting.

---

In re MEYER et al.

(Supreme Court, Appellate Division, First Department. June 10, 1904.)

1. SURROGATE'S COURT—SETTLEMENT OF EXECUTORS' ACCOUNTS—MATTERS RE-
VIEWABLE—AGREEMENTS OF EXECUTORS—CONTINUATION OF PARTNERSHIP.

Testator was a member of a partnership, the articles of which provided that, in case of testator's death before the expiration of five years, his portion of the capital should not be withdrawn, and that his son should have a right to become a member of the firm. Testator died, his son's demand to be admitted as a partner was refused by the surviving partners, and, on suit by the son and executors to enforce the partnership agreement in this respect, it was held that specific performance of the agreement could not be decreed, but that the action of the surviving partners was a breach of the agreement, entitling the executors and son to a decree of dissolution. The firm was realizing large profits, and its continued existence was desirable to the estate, and the son's continued demand that he be admitted as a partner was finally compromised by an agreement by the surviving partners to pay him $3,000 per year, and by the executors on behalf of the estate to pay another person $8,500 per year in consideration of the son's refraining from enforcing a dissolution. Such other person turned over practically all of the money paid to him to

the son. This arrangement was not presented to the Surrogate's Court for approval, but the profits to the estate from the continuance of the business after testator's death amounted to more than the amount testator had invested in the business. *Held*, that the Surrogate's Court had authority, on settlement of the executors' accounts, to pass on the propriety of the arrangement.

2. SAME—AUTHORITY OF EXECUTORS.

The executors were justified in making the agreement with the son, and were not personally liable for the amount paid him from the estate.

3. SAME—ALLOWANCE OF CLAIMS AGAINST ESTATE.

On sale of the interest of an estate in a firm to the surviving partners, on an understanding that the disbursements made by the surviving partners for the estate which had not been adjusted were to be deducted from the price, the surviving partners were allowed a claim for taxes and other disbursements they claimed to have made, and, on this allowance being challenged, the executors made no showing that the disbursements were actually made. *Held*, the executors should be charged with the amount so allowed.

4. TESTAMENTARY TRUST—INCOME OF TRUST ESTATE—METHOD OF DISTRIBUTION.

Testator directed his residuary estate to be divided in four equal parts, portions of which were to be paid to, and other portions held in trust for, his four children. On his death the condition of the estate was such that the executors could not divide it into four funds, and so held it in one. Certain payments and advances were made to some of the children, and the property while held by the executors produced an income. *Held*, that the proper method of distribution was to credit each child's remaining share of the trust fund with that part of the income which bore the same proportion to the total income that his share of the remaining capital bore to the total remaining capital.

5. LEGATEES—STATUS—RIGHT TO SHARE IN INCOME EARNED PENDING DISTRIBUTION.

Testator directed his residuary estate to be divided in four equal portions, parts of three of which were to be held in trust for his three daughters, while the remaining portion was to be paid over to his son, if he should desire it, on attaining his majority. At this time the executors consented that the son should receive his entire interest as soon as the condition of the estate would permit, but did not bind themselves to pay at any particular time, and no understanding was reached as to how his share should be ascertained. Part of the estate was invested in a partnership, which for some years after testator's death, and after the agreement to pay the son his share, made very large profits, and, though the executors made payments to the son from time to time, none of his interest was in form withdrawn from the firm capital, and the executors received interest on his portion of the estate in their hands, and charged him the same rate of interest on payments made to him. *Held*, that he could not be regarded as a creditor of the estate, so as not to be entitled to share in the profits of the partnership.

6. EXECUTORS—FINAL SETTLEMENT—COMMISSIONS.

On final accounting of executors, one executrix was absent from the state and did not join in the petition. She was, however, made a party, and the accounting involved the entire estate. The principal services were rendered by two other executors, and they were allowed full commissions, one-half commission being reserved to await an accounting by the absent executrix, who rendered some services of the same general nature as those rendered by another executor who was allowed one-half commission. *Held*, that the accounting was complete, and the absent executrix entitled to one-half commission.

Appeal from Surrogate's Court.

Judicial settlement of the accounts of Ida Meyer and others, as executors and trustees under the last will of Isaias Meyer, deceased.

From a decree of the Surrogate's Court settling the accounts of the executors and directing a distribution of the trust fund, Louis Lowenstein, as executor, and others appeal. Modified.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

F. R. Minrath, for executors.

Herbert Parsons, for Ida Meyer, individually and as executrix.

William N. Cohen, for Sophie Stark.

Albert Stickney, for Aubrey E. Meyer.

Herbert Parsons, for committee of Linda Meyer, an incompetent person.

LAUGHLIN, J. On the accounting the accounts of the executors were surcharged with the sum of $38,184.57, and they appeal from that part of the decree thus surcharging their accounts.

The correctness of the decision of the surrogate in this regard depends upon transactions between the executors, the surviving partners, and the son of the testator. On the 19th day of May, 1888, the testator and Herman and Alfred Schiffer formed a copartnership for conducting the business of manufacturing and selling silk goods during the period of five years from the 1st day of June, 1888. In the event of the death of Isaias Meyer, it was provided that no part of his capital or surplus capital in the business at the time of his death should be withdrawn before the expiration of the term without the consent of the survivors, but at their option it was to remain in the business, and they were to continue the business, with the privilege to the representatives of the deceased partner, at their own expense, to employ a representative to keep them informed of the condition of the firm business. Interest was to be paid to each partner annually on the capital and surplus profits, so long as left invested with the firm, at the rate of 6 per cent. per annum, and charged as expenses. The business was commenced and continued pursuant to the articles of copartnership. On the 24th day of August, 1888, the testator died. He had a half interest in the firm business and capital invested. The copartnership articles reserved to him the right to have the same modified so as to introduce his son Aubrey into the firm upon the latter attaining his majority or at any time thereafter, the interest of Aubrey in the firm to be part or all the interest of the testator, at the election of the latter, and Aubrey was to receive $1,-500 per annum from the firm, in addition to his share of the capital and profits. Aubrey became of age on the 4th day of February, 1889. By virtue of the will Aubrey took a fourth interest in the residuary estate, one half thereof being payable upon his becoming 21 years of age, and the other half being payable then in the discretion of the executors, or at their election to be retained by them as trustees, paying him the income thereof. The interest of the testator in the partnership became part of his residuary estate. The nineteenth article of the copartnership agreement provided that, if the testator should die before the admission of his son Aubrey into the firm as a partner, Aubrey "shall have the same rights as if he had been a member

of said firm and had become a surviving partner, and when he shall have been admitted as a partner in said firm he shall have the same right as a surviving partner as any of the other parties hereto." Upon attaining his majority, Aubrey demanded that he be admitted into the firm. The executors joined in the demand and endeavored to secure a 10 per cent. interest for him, but the surviving partners refused to comply with the demand. Aubrey and the executors then brought an action against the surviving partners for specific performance of the copartnership agreement to admit him into the firm. The action was tried, and the court delivered an opinion holding that a specific performance of the copartnership agreement in this respect could not be decreed, but that the refusal of the surviving partners to admit Aubrey to the firm constituted a breach of the copartnership agreement which warranted the dissolution of the firm, and that the plaintiffs, as executors, were entitled to a decree to that effect, and appointing a receiver to liquidate its affairs. The copartnership business had been very profitable, and gave promise of greater prosperity in the future. The executors and all parties in interest, including Aubrey, realized that large profits would be made by a continuance of the firm business; that a dissolution at that time would result in a great financial sacrifice; and all, except possibly Aubrey, who was determined to enforce his right to become a member of the firm, were averse to entering a decree in accordance with the opinion, or to having any further litigation in the matter. Negotiations were then had between the surviving partners, the executors, Aubrey, and all parties in interest, or their attorneys, with a view to adjustment without dissolution. The surviving partners were firm in refusing Aubrey admission to the copartnership, and he was firm in insisting upon his rights. The executors and surviving partners proposed to pay him $11,500 per year—$3,000 by the surviving partners, and $8,500 by the estate—as a condition of his permitting the continuance of the firm business by the surviving partners without further litigation. This arrangement met with the approval of all parties in interest except the appellant Stark, who objected upon the ground that it was as much to Aubrey's interest as it was to the interest of the others that the firm should continue, and that he was not entitled to receive any more of the profits than his sisters. As has been seen, however, he was entitled to receive $1,500 per annum from the firm. On further negotiations between Aubrey, the executors, and the surviving partners, it was agreed that the surviving partners should pay him $3,000 per annum from their interest in the firm, and should pay out of the interest of the estate in the firm $8,500 per annum to one Megil, a cousin of Aubrey, who was employed by the firm as a traveling salesman, but whom the executors, under their authority to employ a representative to look after the interests of the estate in the firm, in form employed for that purpose. A formal agreement to this effect was made and consummated and followed throughout the period prescribed for the continuance of the copartnership, but it was not submitted to the appellant Stark or to the Surrogate's Court for approval, or approved by either. Megil rendered very little service

to the executors, and an arrangement was made at the outset between him and Aubrey by which he turned over to the latter the $8,-500 per annum, less a small commission, aggregating, during the three years, $2,525. It is evident that this was the principal inducement to Aubrey to consent to the settlement. The executors were not parties to the understanding between Megil and Aubrey, but they must have been aware that some such arrangement had been made. On settlement with the surviving partners at the expiration of the period for the continuance of the business, the estate was charged with the amount thus paid to Megil. The amount surcharged to the accounts of the executors is the amount of these payments, with interest.

Counsel for the executors contends that the Surrogate's Court was without jurisdiction to question this settlement. We do not agree with this contention. The Surrogate's Court has not been given equity jurisdiction to set aside assignments of claims for fraud or mistake (Matter of Randall, 152 N. Y. 508, 46 N. E. 945), but this rule has no application to settlements made by the executors in administering the estate. The Surrogate's Court is authorized to pass upon the acounts of the executors, and this authority necessarily confers jurisdiction to pass upon every item of disbursements for which the executors claim they should be allowed. The committee of Linda Meyer and Mrs. Stark opposed the modification of the decree by striking out this surcharge. They claim that the employment of Megil was a subterfuge, and that the question is to be determined the same as if the executors had made the agreement direct with Aubrey. Aubrey was appointed an executor of his father's will, but he refrained from qualifying until after this settlement was made. Counsel for the executors claims that the interests of the estate justified and required the settlement with Aubrey. It is not essential to the validity of that settlement that it should be decided that Aubrey in his individual right, or by qualifying as an executor, or by an application to the court for a direction to the executors who had qualified, could have enforced a dissolution of the copartnership. It is sufficient that he asserted a claim in this regard which was not wholly without merit, and threatened legal proceedings for its enforcement, and that the executors acted in good faith in making the settlement. The value of the capital belonging to the estate which remained invested in the firm after the death of the testator was $454,721.63, and the profits realized thereon by the estate amounted to $521,600.40, more than $230,000 of which was made after the settlement with Aubrey. Although the executors, doubtless, had reason to believe that Aubrey was to receive some benefit from the payment to Megil, yet Aubrey, as a condition of the settlement, insisted upon this payment to him or to Megil, and there is no doubt that the executors acted in good faith in making the settlement. They deemed it for the best interest of all concerned, and manifestly it was. The testator attempted to secure the right to Aubrey to be admitted into the firm, and this right Aubrey was justified in asserting. It cannot be said that there was no basis for further litigation by him with a view to en-

forcing this right or to obtaining redress for the breach of the agreement by dissolution of the copartnership. The executors would therefore have been justified in making the agreement to pay $8,500 to Aubrey as a condition of his refraining from further litigation in the premises and allowing the partnership to continue, and they were justified in making the agreement, at his instance, to pay it to Megil. Therefore we think the surcharge of the accounts of the executors was not authorized, and that the decree should be modified in that regard accordingly.

By virtue of the copartnership articles the surviving partners, at the expiration of the period fixed for the continuance of the business by the firm, had the right to purchase the interest of their deceased partner. The interest of the estate in the firm was purchased by the surviving partners pursuant to this provision. In making the settlement, the value of the interest of the estate was agreed upon on the understanding that the disbursements made by the surviving partners for the estate, which had not been adjusted, were to be deducted, and the surviving partners were allowed to deduct a claim of $8,242.36 for "taxes and other disbursements" which they claimed to have made on account of the interest of the estate. No vouchers for the payment of this amount were presented by the executors, and it is claimed that these disbursements should not have been allowed. The disbursements were not made by the executors. They were made, if at all, by the surviving partners in the course of conducting the partnership business. In these circumstances it was not essential that the executors should produce vouchers, but it does not satisfactorily appear that they could not have done so. In the absence of vouchers, they should have shown that the disbursements were actually made by the surviving partners for the benefit of the estate. This they failed to do, and therefore they were not entitled to be credited, but should have been charged, with the amount thereof. If the disbursements were not actually made by the surviving partners, they should not have been allowed therefor by the executors; and, if allowed through misrepresentations by the surviving partners, the executors would have had a cause of action against them to recover the amount. The executors claim that they realized from the surviving partners the fair value of the interest of the estate, and all that the surviving partners were willing to pay therefor. But the evidence in this record does not justify the allowance of these disbursements, or render the question immaterial on that theory. The offer of the surviving partners appears to have been made and accepted on the basis that they were to deduct the disbursements made for the account of the estate. It is true they claimed to have made these disbursements, but there does not appear to have been any controversy over it other than can be deemed to have been compromised. The disbursements being challenged, the executors were called upon to justify the allowance, which they have not done. The formal settlement of the accounts did not, and could not, embrace these disbursements, for that was before the settlement with the surviving partners. It is quite likely that these disbursements were made for the benefit of the estate; but when the allowance of the disbursements was chal-

lenged by the objections filed to the account, the executors should have shown that they were proper charges.

The appellants Stark and Aubrey E. Meyer complain of the method of distribution. The executors were directed to divide the residuary estate into four equal parts for the benefit of the testator's four children. Mrs. Stark, being married, was entitled to receive at once one-fourth of her fourth, less $15,000 advanced to her by the testator. The remainder of her share was to be held by the executors as trustees in trust, the income to be paid to her during her life, and at her death the principal was to go to her issue. Linda Meyer, the incompetent person, was to receive one-fourth of her fourth upon her marriage, the remainder to be held in trust, she to be paid the income during her life, and the remainder to go to her issue. The provisions for Irma, the other daughter, were the same. Neither of these daughters married. Aubrey, as already stated, was to have one half of his fourth upon attaining his majority, and the other half at that time, or thereafter in the discretion of the executors, or, if they so elected, it was to be held in trust, he to receive the income during life, and the remainder to go to his issue. The executors, owing to the continuance of the partnership, which was formed after the will was made, and probably not anticipated by the testator, could not divide the entire estate into four trusts as directed by the will, and so they did not then divide the funds, which, exclusive of the interest of the estate in the firm, amounted to nearly a quarter of a million dollars, but retained the same in one fund. The method adopted for distribution, which has been approved, was this: The present value of the entire residuary trust property in the hands of the executors was taken, and to it was added the amount of all payments made on account of the different shares, including the advancement by the testator to Mrs. Stark, with interest at 4½ per cent., compounded semiannually, from the time of making the respective payments, to August 1, 1900, when the accounts were filed. This rate of interest was adopted because it was the rate earned by the funds in the hands of the executors every six months. The aggregate of these amounts, which represents approximately the amount that would have been in the hands of the executors at the time of accounting if nothing had been paid or advanced on account of the respective shares, was divided into four equal parts, one of which was assigned as the share of each child. From each of these separate funds was then deducted the amount paid or advanced to the child for whom the fund was set apart, with 4½ per cent. interest, likewise compounded semiannually to the date of filing the account. Mrs. Stark and Aubrey claim that the method adopted was erroneous. The former claims that interest should not have been charged on her advancement, and the latter that interest should not have been charged on the payments made to him. We agree with the learned counsel for Mrs. Stark that the proper method was to credit each child's remaining share of the trust fund semiannually with that part of the income earned during such period as bears the same proportion to the total income as his share of the remaining capital bears to the total remaining capital employed in earning the income. The result, however, by following this method, would be the same—excluding from consideration the interest of the estate in the partnership and

the profits thereon—as that arrived at by the method pursued. This is because the principal and the interest credited and charged are the same. The trust funds, instead of being divided as they exist, giving to each beneficiary his share of the remaining principal—having in mind the amount of principal already advanced to or drawn by him, and his proportionate share of the income; having in mind that on account of the withdrawal, by advancement or payment, of part of his share of the principal, he has not had as much capital invested on which the income was earned as those whose shares remain intact—are theoretically augmented to the figures that would probably represent them if no withdrawal or advancement had taken place, and they divided and deductions made, on account of the appropriate shares, to reduce the gross amount to the present value of the estate on hand, which is thus divided equitably among the cestuis que trust according to their respective interests. The withdrawn principal and last interest thereon being credited to the gross fund before division, and their being deducted from the appropriate separate shares thereof, it might seem at first that this would result inequitably as against one not strictly chargeable with interest, because all are credited with the interest and he alone is charged. A calculation, however, will demonstrate that this does not result inequitably, at least not where, as here, the rate of interest credited and charged is the same. If Mrs. Meyer and Aubrey were, respectively, in fact, charged interest on the advancement and payments, that, being contrary to the general rule, could not be justified; but, as has been seen, these were not actual charges, and the result is the same as if it had been figured the other way, without charging any interest, and determining their share of the income by their proportionate share of the principal upon which it was earned.

Mrs. Stark claims that Aubrey should be treated as a creditor of the estate to the extent of his entire interest from the date of his majority, on the theory that the executors then elected at his request to pay over to him his entire interest, and that he be allowed interest until the time the payments were actually made to him. This would deprive Aubrey of participating in the profits of the copartnership. When he became of age the executors did consent that he should receive his entire interest as soon as the condition of the estate would permit the payment thereof. They did not, however, bind themselves to pay over at any particular time, nor did the parties come to an understanding as to the value of his interest, or as to how the same should be ascertained. His share, aside from that part of the estate invested in the partnership, was more than $50,000, and the executors received interest on this, as well as large amounts of interest and surplus profits from the partnership. None of his interest was in form withdrawn from the firm capital, and no other interest was in form substituted for it, nor does this appear to have been considered. The executors made payments to him from time to time from the surplus income in their hands. It may be that at times he received more than his share of the surplus income and of the principal not invested in the firm; but it would be very difficult to determine that fact, and, even if so, none of the parties appear to have been prejudiced, for he has been charged the same rate of interest on the payments made to him as the executors were receiving

on the surplus income of his sisters in their hands, which, on account of the infancy of one and incompetency of another, had, with the exception of sufficient for their support and maintenance (Matter of McCormick, 40 App. Div. 73, 57 N. Y. Supp. 548, affirmed 163 N. Y. 551, 57 N. E. 1116), to be left in the hands of the executors or trustees. If a loss had been sustained by the continuance of the partnership, we apprehend that Aubrey's sisters would urge with considerable force that the consent of the executors to pay over his entire share was so indefinite, and left the matter so completely to the discretion of the executors, that the relation of creditor did not result, but that Aubrey still remained one of the cestuis que trust, and as such should stand his share of the loss. Moreover, it is evident that Aubrey did not intend to surrender his right to share in the fruits of the copartnership, and the agreement made with the executors is susceptible of the construction that he was to receive his interest from time to time as the funds on hand would permit, the final payment, however, not to be made until it could be ascertained by the termination of the partnership. If the executors used some of the surplus income of his sisters in making certain payments to him, they did so on their own responsibility, and would remain liable to the other beneficiaries therefor. If they deliberated sufficiently to realize that they were over paying Aubrey, they doubtless deemed they were protected by the remaining interest of Aubrey in that part of the estate invested in the partnership. We are of opinion, therefore, that this claim on the part of Mrs. Stark is not tenable.

At the time the petition for an accounting was filed, Mrs. Meyers, an executrix, was in Europe, and she did not join in the petition. She was, however, made a party to the proceeding, and it appears that the accounting involved the entire property of the estate. It has been treated as an accounting merely by the petitioning executors, and the court has reserved one-half of one commission to await an accounting by her. She claims that the accounting should be treated as a final accounting by all, and that the reserved commission should be allowed and paid to her. It appears that the principal services were rendered by the executors Lauterbach and Lowenstein. The court accordingly, in apportioning the commissions pursuant to the provisions of section 2730 of the Code of Civil Procedure—the personal property of the estate exceeding in value $100,000—allowed one full commission to each of the executors Lauterbach and Lowenstein, and one-half of one commission to Aubrey. Aubrey claims that Mrs. Meyer rendered no services, has not accounted, does not intend to account, that nothing remains to require an accounting by her, and that therefore he should receive the reserved commission. We are of opinion that the accounting was complete. Mrs. Meyer rendered some services, and they were of the same general nature as those rendered by Aubrey. We think it just that she should receive the same commission. The decree should therefore be modified by directing the payment of the reserved commission to her.

It follows, therefore, that the decree should be modified by striking out the surcharge of $38,184.57 made to the accounts of the executors, by directing the payment of the reserved commission to Mrs. Meyer,

and by charging the executors with $8,242.36 which they allowed the surviving partners to deduct from the purchase price of the interest of the estate in the partnership, and interest thereon from the date of the settlement with the surviving partners, with the privilege, however, to the executors of a rehearing before the Surrogate's Court on this question, and, as modified, affirmed, with separate bills of costs to each appellant and respondent appearing separately, one fourth thereof to be paid out of each of the four trust funds for the children in the hands of the executors.   All concur.